```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MISSOURI
                          EASTERN DIVISION
```

ANGELA M. GAHAN,                )
                                )
            Plaintiff,           )
                                )
      v.                         )     No. 4:09 CV 1982 CAS / DDN
                                )
                                )
MICHAEL J. ASTRUE,              )
Commissioner of Social Security, )
                                )
            Defendant.           )

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This action is before the court for judicial review of the final decision of defendant Commissioner of Social Security denying the application of plaintiff Angela M. Gahan for supplemental security income under Title XVI of the Social Security Act (the Act), 42 U.S.C. §§ 401-34. The action was referred to the undersigned United States Magistrate Judge for review and a recommended disposition under 28 U.S.C. § 636(b). For the reasons set forth below, the undersigned recommends that the ALJ's decision be reversed and remanded.

**I.  BACKGROUND**

Plaintiff, who was born in 1963, filed her application on April 2, 2007, alleging an onset date of disability of November 11, 2006. (Tr. 108.) She alleged disability due to right leg lesions, swelling, pain, and numbness. (Tr. 128.)

Plaintiff's application was denied on August 17, 2007 (Tr. 73-78), and a timely request for a hearing was filed. (Tr. 81.) On April 29, 2009, following a hearing, an administrative law judge (ALJ) issued a decision finding that plaintiff was not disabled as defined under the Act at any time through the date of the decision for purposes of Title XVI. (Tr. 20.) On October 7, 2009, the Appeals Council denied her request for review. (Tr. 1-3.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  MEDICAL AND OTHER HISTORY

On November 28, 2006, Mohammed Tahir, M.D., a cardiologist, wrote to Jawad H. Siddiqui, M.D., an infectious disease specialist, "[Plaintiff] has been symptomatic with easy fatigueability, weakness, extreme tiredness, short of breath (sic), and her exercise tolerance is approximately 100 meters [at] which [time] she has to rest." (Tr. 193-94.)  She was unable to complete a stress test because of exhaustion and chest heaviness. (Tr. 194.)  In November and December 2006, her gait was normal.

On January 23, 2007, plaintiff was admitted to Christian Hospital for ten days with a right leg infection, at which time she underwent multiple skin incisions and a decompression fasciotomy[1] to her right lower leg and thigh.  (Tr. 219.)  Amit Dhingra, M.D., diagnosed right leg cellulitis[2] leading to deep tissue infection with fasciatus;[3] a leaky heart valve; and depression. (Tr. 219.)  He prescribed antibiotics, pain relievers, and an anti-depressant.  (Tr. 219.)

On March 20, 2007, plaintiff was admitted to the Emergency Department at Northwest Healthcare with a rash on her back and extremities.  (Tr. 277.)  Thomas E. Shrine, M.D., noted multiple well-circumscribed ulcers with crust on her back and extremities.  (Tr. 279.)  July 2007 nerve testing of plaintiff's right leg showed possible "very mild" peroneal[4] nerve neuropathy.[5]  (Tr. 325.)

---

[1] Incision through a fascia; used in the treatment of certain disorders and injuries when marked swelling is present or anticipated that could compromise blood flow. Stedman's Medical Dictionary 707 (28th ed. 2006).

[2] Cellulitis is inflammation of subcutaneous, loose connective tissue (formerly called cellular tissue).  Stedman's at 343.

[3] Inflammation in fascia, a sheet of fibrous tissue that envelops the body beneath the skin.  Stedman's at 700, 706.

[4] The small bone at the arm or leg.  Stedman's at 1466.

[5] A class term for any disorder affecting any segment of the nervous system.  Stedman's at 1313.

-2-

On October 31, 2007, Steven W. Baak, M.D., a rheumatologist, described plaintiff as:

> [A] very unfortunate lady who has chronic eczema . . . and has a lot of stress and anxiety in her life but recently had some dramatic complications of lower extremity eczematous lesions and had cellulitis with an invasive infection that was drained through multiple incisions into her lower extremity on the right side. Since that time she has had pain and swelling on that leg and work up showed multiple negative deep venous dopplers and nerve conduction studies showed primary damage to right superficial nerves related to her multiple incisions and damage to the right lower leg.

(Tr. 371.) Tests that day showed a marked positive antinuclear antibody (ANA) of 1:640.2;[6] a positive rheumatoid factor (RF) level of 1:40;[7] and elevated sedimentation rate (ESR) of 49.[8] (Tr. 370.)

---

[6]An antinuclear antibody (ANA) test measures the amount and pattern of antibodies in your blood that work against your own body (autoimmune reaction). The body's immune system normally attacks and destroys foreign substances such as bacteria and viruses. But in disorders known as autoimmune diseases, the immune system attacks and destroys the body's normal tissues. When a person has an autoimmune disease, the immune system produces antibodies that attach to the body's own cells as though they were foreign substances, often causing them to be damaged or destroyed. Rheumatoid arthritis and systemic lupus erythematosus are examples of autoimmune diseases.

An ANA test is used along with symptoms, physical examination, and other tests to find an autoimmune disease. WebMD, Rheumatoid Arthritis, http://arthritis.webmd.com/antinuclear-antibodies-ana (last visited November 3, 2010).

[7]The rheumatoid factor test is a commonly ordered test to help diagnose rheumatoid arthritis. The test measures rheumatoid factor, which is an antibody in the blood that is present in many people with RA. WebMD, Rheumatoid Arthritis, http://www.webmd.com/rheumatoid-arthritis/guide/rheumatoid-factor-test (last visited Nov. 4, 2010).

[8]The sedimentation rate (sed rate) blood test measures how quickly red blood cells (erythrocytes) settle in a test tube in one hour. The more red cells that fall to the bottom of the test tube in one hour, the higher the sed rate.

(continued...)

On November 28, 2007, Dr. Baak completed a Physician's Assessment for Social Security Disability Claim, stating that plaintiff suffers from nerve damage in her left lower leg, chronic venous stasis[9] in her right lower leg, rheumatoid arthritis (RA),[10] and Reflex Sympathetic Dystrophy (RSD)[11] in her right leg. He opined that she had very poor exercise tolerance and was markedly immobilized with pain. (Tr. 368.) Dr. Baak opined that she was not able to sustain full-time employment at the sedentary level and noted she was not having success with her pain medication. (Tr. 368.)

---

[8](...continued)
When inflammation is present in the body, certain proteins cause red blood cells to stick together and fall more quickly than normal to the bottom of the tube. These proteins are produced by the liver and the immune system under many abnormal conditions, such as an infection, an autoimmune disease, or cancer.

There are many possible causes of a high sedimentation rate. For this reason, a sed rate is done with other tests to confirm a diagnosis. After a diagnosis has been made, a sed rate can be done to help check on the disease or see how well treatment is working. WebMD, Sedimentation Rate, http://www.webmd.com/a-to-z-guides/sedimentation-rate (last visited Nov. 3, 2010).

[9]Stagnation of the blood or other fluids. Stedman's at 1829.

[10]A generalized disease, occurring more often in women, which primarily affects connective tissue; arthritis is the dominant clinical manifestation, involving many joints, especially those of the hands and feet, accompanied by thickening of articular soft tissue, with extension of synovial tissue over articular cartilages, which become eroded; the course is variable but often is chronic and progressive, leading to deformities and disability. Stedman's at 160.

[11]Reflex sympathetic dystrophy syndrome (RSD), also known as complex regional pain syndrome, is a rare disorder of the sympathetic nervous system that is characterized by chronic, severe pain. The sympathetic nervous system is that part of the autonomic nervous system that regulates involuntary functions of the body such as increasing heart rate, constricting blood vessels, and increasing blood pressure. Excessive or abnormal responses of portions of the sympathetic nervous system are thought to be responsible for the pain associated with reflex sympathetic dystrophy syndrome. Web MD, Reflex Sympathetic Dystrophy, http://www.webmd.com/brain/reflex-sympathetic-dystrophy-syndrome, (last visited Oct. 19, 2010).

Plaintiff saw Jacquelyn B. Garrett, M.D., a dermatologist, from March 8, 2007 to November 8, 2008, for eczema and follow-up on the surgical wounds on her lower legs. (Tr. 289-292, 383-389.) Plaintiff was taking diluted bleach baths once a month and using a pH cleanser once a week for her eczema. At that time she was experiencing tingling, painful sensations in her legs and swelling at night. (Tr. 291, 382.)

On September 17, 2007, plaintiff was seen by Dr. Garrett for an itchy rash on her arms, face, legs, hands, and back. (Tr. 383.) On October 4, 2007, she returned to Dr. Garrett for recurring itching, redness, and bumps, which sometimes leaked, on her legs, buttocks, back, neck, chest, thigh, and groin area. Plaintiff elevated her legs and wore compression stockings when her legs were not leaking. (Tr. 383-384.) On October 15, 2007, Dr. Garrett noted that plaintiff had small recurring blisters on her hands and continued ankle swelling. (Tr. 384.)

On November 2, 2007, a bone scan suggested RSD. (Tr. 372.) In addition, mild to moderate uptake or absorption was seen in the ankle joints and midfoot bilaterally, consistent with degenerative disease.

On January 31, 2008, plaintiff saw Dr. Baak for tingling and numbness in her left leg. (Tr. 401.) Plaintiff had an elevated sedimentation rate (ESD), and strongly positive ANA and rheumatoid factor (RF). (Tr. 401.) Dr. Baak's working diagnosis was Systemic Lupus Erythematosus/Rheumatoid Arthritis overlap. She was started on methotrexate, a drug used to treat RA. (Tr. 401.)

On May 1, 2008, Dr. Baak wrote Dr. Siddiqui, stating that "[Plaintiff] still has very severe levels of pain and debility despite methotrexate therapy for rheumatoid arthritis." (Tr. 400.) On August 5, 2008, Dr. Baak wrote Dr. Siddiqui, reporting that cortisone shots in both shoulders and high doses of methotrexate were not controlling plaintiff's symptoms. His impression was poorly controlled RA and rotator cuff tendinitis. (Tr. 399.)

In September 3, 2008 correspondence to SSM Healthcare DePaul Medical Group Family Support Division, Dr. Baak described plaintiff as a "chronically debilitated woman who has RA and a history of extensive nerve damage to the lower extremities which leads to chronic burning pain. She has dramatic leg weakness and difficulty walking and uses a cane at all

times. She takes multiple medications that leave her sedated and muddy-headed, and as a result she has a very difficult time performing activities of daily living and is completely disabled from her work." (Tr. 398.) On November 8, 2008, Dr. Garrett noted that her itching seemed to worsen at night and that Ultravate, an anti-inflammatory and anti-pruritic cream used to treat skin conditions, provided little relief. (Tr. 389.)

On March 4, 2009, Dr. Baak completed a Physician's Assessment for Social Security Disability Claim, listing plaintiff's current diagnoses as RA, degenerative disc disease in the knee, chronic low back pain, and anxiety. (Tr. 397.) Dr. Baak stated plaintiff's endurance was "very severely affected" by her impairments, "due to problems with cognition due to poor pain control and unpredictable variations in pain." (Id.) In response to whether plaintiff could perform sustained full-time employment at the sedentary level, Dr. Baak wrote, "No. Severe baseline debility, frequent pain flare ups, and a depressive personality makes work not an option." (Id.)

On May 20, 2009, plaintiff saw Dr. Garrett for eczema. Dr. Garrett noted that plaintiff had skin flare-ups when her RA and RSD worsened. Her methrotrexate was increased. (Tr. 387.)

**Testimony at the Hearing**

On March 25, 2009, a hearing was conducted before an ALJ. (Tr. 25-49.) Plaintiff testified that she was 45 years old and had completed two years of college courses. (Tr. 28.) She lived with her ten year-old son in her parents' home. (Tr. 27.) She last worked in November 2006 as an assistant manager at a maternity wear store. (Tr. 16.)

Plaintiff's RA affected the joints in her knees, legs, hands, fingers, and jaw. (Tr. 63.) She testified that her legs affected her ability to work; that her problems began following an infection in her right leg; and that she experienced pain that started in her toes and traveled up her foot to her knee. (Tr. 44.) Her legs would swell in mid-afternoon or at night, and she often needed compression hose. (Tr. 45.) Besides RA, she testified that RSD in her right leg caused constant

pain; that her leg would buckle unexpectedly; and that she always used a cane. (Tr. 43-44, 57.)

Plaintiff elevated her legs five to seven times a day for ten to twenty minutes at a time. Her legs became stiff when she was not able to elevate them, and a shock-like pain would radiate throughout them. (Tr. 53-56.) Standing was difficult for her unless she was able to lean against something sturdy. (Tr. 49-50.) She could stand for approximately ten minutes without a cane; walk about a block before needing to sit down or lean on something; and sit for about fifteen minutes at a time. (Tr. 51.) She often needed to shift positions or move around to get comfortable. (Tr. 51.)

Plaintiff testified that she was in a "world of pain." (Tr. 46.) She took Tramadol and Tylenol for pain; Gabapentin for neuropathic pain; and Hydroprofen, a narcotic pain reliever. (Tr. 46.) The medications took the edge off her pain, but her pain level was still an 8 or 8.5 on a ten-point scale. (Tr. 58.) The medications also made her sleepy, resulting in frequent naps. (Tr. 49, 62.) She had difficulty concentrating and sleeping at night, and slept approximately four to five hours per night. (Tr. 49, 54.)

Plaintiff testified that she was losing the grip in both of her hands; that it felt like someone was pushing her arm down; that her hands would suddenly open; and that she frequently dropped cartons of milk. (Tr. 50-51.) Her son did her laundry. She could not complete any household chores, including cooking, washing dishes, or vacuuming, and could grocery shop only with assistance.

Dolores Gonzalez, a vocational expert (VE), testified at the hearing. The ALJ set forth a hypothetical individual who could lift a maximum of ten pounds; a sit/stand option with the ability to change positions frequently; could climb stairs and ramps occasionally; never climb ropes, ladders or scaffolds; can occasionally stoop, kneel, and crouch; can never crawl; and can occasionally do handling and gross manipulation and fingering and fine manipulation. (Tr. 66.) The VE testified that there were a variety of jobs such as call out operator, election clerk, and surveillance system monitor that could be performed with plaintiff's residual functional capacity (RFC).

-7-

### III. DECISION OF THE ALJ

On April 29, 2009, the ALJ entered an unfavorable decision. (Tr. 11-21.) The ALJ found that plaintiff had not engaged in substantial gainful activity since April 2, 2007, her application date. The ALJ found that plaintiff had the following impairments: rheumatoid arthritis, peripheral neuropathy and the residual effects of a right leg infection. (Tr. 13.) The ALJ concluded plaintiff did not have an impairment or combination of impairments that meets or medically equals a listed impairment in 20 C.F.R. Part 404.

The ALJ determined that plaintiff had the residual functional capacity (RFC) to perform sedentary work as described in the regulations, with the following functional limitations: (1) lifting a maximum of ten pounds; (2) a sit/stand option at work with the ability to change her position frequently; (3) occasionally climb stairs and ramps, stoop, kneel and crouch; (4) never climb ropes, ladders, scaffolds or crawl; and (5) occasionally perform handling/gross manipulation and fingering/fine manipulation. (Tr. 15.)

The ALJ further found that plaintiff was born on July 12, 1963, and was 43 years old, which is defined as a younger individual on the date her application was filed; that she was unable to perform her past relevant work (PRW); and that she had acquired work skills from her PRW. (Tr. 19.) After obtaining testimony from a VE, the ALJ identified jobs, including call out operator, election clerk, and surveillance system monitor, that could be performed with an individual with plaintiff's RFC. (Tr. 20.) Thus, the ALJ determined that plaintiff was not disabled under the Act.

### IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and is supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the

Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d 935, 942 (8th Cir. 2009). A five-step regulatory framework is used to determine whether an individual qualifies for disability. 20 C.F.R. §§ 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Id. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform her PRW. Id. The claimant bears the burden of demonstrating he is no longer able to return to his PRW. Id. If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work. Id.

## V. DISCUSSION

Plaintiff argues the ALJ erred in (1) failing to consider the opinion evidence of her treating rheumatologist, Dr. Steven Baak; and (2) failing to apply the Polaski factors in assessing her RFC.

**A. Opinion Evidence of Treating Rheumatologist Dr. Steven Baak**

-9-

Plaintiff argues the ALJ erred in failing to properly consider the opinion evidence of her treating rheumatologist, Dr. Baak. Dr. Baak opined about plaintiff's work-related limitations in two assessments dated November 28, 2007 and March 4, 2009, and in correspondence dated September 3, 2008 to SSM Healthcare. (Tr. 368, 397-98.) Plaintiff argues that Dr. Baak's opinion that she is markedly immobilized with pain, that she has had minimal success with multiple pain medications, and that she has severe problems with cognition and endurance due to her impairments, along with a depressive personality and anxiety (Tr. 368, 397-98), support a finding that she is disabled. In response, the Commissioner argues that the ALJ properly considered the medical opinion evidence of record.

The ALJ is required to assess the record as a whole to determine whether treating physicians' opinions are inconsistent with substantial evidence on the record. 20 C.F.R. § 404.1527(d)(2). A treating physician's opinion is generally given controlling weight, but is not inherently entitled to it. Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006). See 20 C.F.R. § 404.1527(d)(2). An ALJ may elect under certain circumstances not to give controlling weight to treating doctors' opinions. A physician's statement that is not supported by diagnoses based on objective evidence will not support a finding of disability. Edwards v. Barnhart, 314 F.3d 964, 967 (8th Cir. 2003). If the doctor's opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight. Id.; see also Hacker, 459 F.3d at 937; 20 C.F.R. § 404.1527(d)(2). It is the ALJ's duty to resolve conflicts in the evidence. See Hacker, 459 F.3d at 936.

The ALJ stated in his opinion:

> Dr. Baak apparently relied quite heavily on the subjective report of symptoms and limitations described by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported. Yet, as explained elsewhere in this decision, there exists good reasons for questioning the reliability of the claimant's subjective complaints, in light of the objective findings. Dr. Baak's own office notes and reports fail to reveal the type of significant clinical and laboratory abnormalities one were to see if the claimant were in fact disabled.

(Tr. 17.)

The undersigned finds the ALJ's decision to reject Dr. Baak's decision lacks support in the record. Specifically, on October 31, 2007, Dr. Baak reported that plaintiff had a marked positive ANA of 1:640.2. (Tr. 370.) Plaintiff also had a positive rheumatoid factor (RF) level of 1:40 and elevated sedimentation rate (ESR) of 49, laboratory markers of RA. In October 31, 2007 correspondence, Dr. Baak wrote that plaintiff had a lot of stress and anxiety in her life, but recently had some dramatic complications of lower extremity eczematous lesions and cellulitis. (Tr. 371.) On November 2, 2007, a Limited Area Bone Scan demonstrated a pattern in the joints suggestive of RSD. (Tr. 372.) Mild to moderate uptake or absorption was seen in the ankle joints and midfoot, consistent with degenerative disease. On November 28, 2007 Dr. Baak diagnosed plaintiff with nerve damage, RA, and chronic venous stasis and RSD of the right leg. (Tr. 368.) Dr. Baak wrote, "[Plaintiff] is markedly immobilized with pain." (Tr. 368.) In correspondence dated May 1, 2008, Dr. Baak wrote, that plaintiff "still has very severe levels of pain and debility despite methotrexate therapy for RA." (Tr. 400.)

The undersigned does not find specific instances cited in the ALJ's decision indicating that Dr. Baak relied solely on plaintiff's reports of symptoms, rather than clinical or laboratory findings to support his findings. As noted above, Dr. Baak's records reflect positive laboratory markers of RA. However, the ALJ did not cite these objective results. (Tr. 370-71.) In addition, plaintiff's problems with leg weakness and use of a cane are referenced in treatment notes of Dr. Baak and others, contradicting the ALJ's statement that none of Dr. Baak's treatment notes refer to these symptoms. (Tr. 17, 346, 370, 398.) In addition, Dr. Garrett, plaintiff's dermatologist, instructed plaintiff to elevate her legs and use compression stockings. (Tr. 292.)

Based on the above, the undersigned concludes the ALJ's decision to reject Dr. Baak's opinion is not supported by substantial evidence in the record as a whole. As a consequence, the ALJ erred by not giving Dr. Baak's opinions controlling weight. 20 C.F.R. § 404.1527(d)(2).

**B.  Polaski Factors and RFC Assessment**

Plaintiff next argues the ALJ erred in failing to apply the Polaski factors in assessing her RFC. She complains that the ALJ does not apply the Polaski factors anywhere in his opinion, and that although the ALJ mentions Dr. Baak's observations about daily activities, pain, and effectiveness of medications, he then disregards them without citing any evidence to the contrary. The Administration does not address this argument in its brief.

"In analyzing a claimant's subjective complaints, such as pain, an ALJ must consider: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the condition; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions." Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001). Other factors also include the claimant's "relevant work history and the absence of objective medical evidence to support the complaints." (Id.) The above factors are derived from Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). While ALJs must acknowledge and consider the so-called Polaski factors before discounting a claimant's subjective complaints, the Eighth Circuit has held ALJs "need not explicitly discuss each Polaski factor." Goff, 421 F.3d at 791. ALJs may discount claimants' complaints if there are inconsistencies in the record as a whole, and the reviewing court "will defer to an ALJ's credibility finding as long as the ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so." Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007).

In this case the ALJ discredited plaintiff's assertion that she was unable to work due to her impairments. The ALJ based his credibility determination on several factors, including the fact that plaintiff's use of a cane was not prescribed by a doctor; however, a doctor advised her to use a cane if it made her feel more comfortable. The ALJ also noted that although plaintiff was described as being unable to work because of frequent pain flare-ups, as well as an anxious and depressive personality, there was no indication that she was referred to or sought mental health treatment. The ALJ further found plaintiff's allegedly limited daily activities could not be objectively verified with any reasonable degree of certainty. The ALJ further found that even if plaintiff's daily activities were as limited as alleged, it was difficult to attribute the degree of

-12-

limitation to her medical condition, as opposed to other reasons, in view of the relatively weak and inconclusive medical evidence and other factors. (Tr. 18.)

The ALJ also found a disconnect between the symptoms described in treatment notes and those she described in her disability application. The ALJ found that the fact that she did not report to her doctor that her ability to work was impaired by side effects from medications made it difficult to attribute significant functional limitations to side effects from medication. (Id.) The ALJ also found her work history diminished her credibility because she had worked only sporadically prior to her alleged disability onset date. (Tr. 18.)

With respect to daily activities, the ALJ found that plaintiff was able to walk effectively, to sustain a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living; and to travel without companion assistance to and from a place of employment or the store. The ALJ found she did not need to use a walker, two crutches or two canes; she was able to walk a block at a reasonable pace on rough or uneven surfaces; she would be able to use public transportation; and she was able to shop and bank. The ALJ further found that she was able to perform fine and gross movements effectively, and that she was capable of sustaining functions such as reaching, pushing, pulling, grasping, and fingering to be able to carry out her activities of daily living. The ALJ found that she was able to prepare simple meals and feed herself; that she was able to perform personal hygiene; and that she was able to handle and sort papers and files and place files in a file cabinet at or above waist level.

The duty of deciding questions of fact, including the credibility of a plaintiff's subjective testimony, rests with the Commissioner. Nelson v. Sullivan, 966 F.2d 363, 366 (8th Cir. 1992). The crucial question is not whether a claimant experienced pain, but whether the claimant's credible subjective complaints prevent her from performing any type of work. McGinnis v. Chater, 74 F.3d 873, 874 (8th Cir. 1996). If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, the court will normally defer to the ALJ's credibility determination. Russell v. Sullivan, 950 F.2d 542, 545 (8th Cir. 1991).

Here, given the ALJ's faulty discrediting of the opinions of plaintiff's treating physician, the ALJ's decision concerning plaintiff's credibility is not supported by substantial evidence in the record.

As to plaintiff's argument that the ALJ erred in failing to provide a medical basis for her RFC, the undersigned agrees. Residual Functional Capacity is a function-by-function assessment of an individual's ability to do work-related activities based on all the evidence. Casey v. Astrue, 503 F.3d 687, 696 (8th Cir. 2007). The ALJ has the responsibility of determining a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians, examining physicians, and others, as well as the claimant's own descriptions of her limitations. Pearsall v. Massanari, 274 F.3d 1211, 1217-18 (8th Cir. 2001). Before determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Id. Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace. Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000).

The ALJ stated:

> [T]he claimant has the RFC to perform sedentary work as defined in 20 CFR 416.967(a) where she only needs to lift a maximum of 10 pounds, she must have a sit/stand option at will with the ability to change her position frequently; she can occasionally climb stairs and ramps, stoop, kneel and crouch; she can never climb ropes, ladders, scaffolds or crawl; and she can occasionally perform handling/gross manipulation and fingering/fine manipulation.
>
> In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirement of 20 CFR 416.929 (incorporating and expanding upon Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984)); SSR 96-4p and SSR 96-7p.

(Tr. 15.)

The ALJ here referenced Dr. Baak's observations about daily activities, pain and effectiveness of medications, but ultimately

-14-

disregarded them. (Tr. 17-18.) Once Dr. Baak's opinion is discounted, there is no evidence in the record concerning how plaintiff's impairments affected her ability to function during the period of inquiry to support the ALJ's RFC determination. The ALJ should have sought further opinion from plaintiff's treating physician or ordered a consultative examination to assess plaintiff's RFC. See Nevland, 204 F.3d at 858 (where there is no medical evidence about how claimant's impairments affect his ability to function, ALJ should have sought opinion of treating physician, or alternatively, ordered consultative examinations).

Since the ALJ did not consider the opinion of Dr. Baak, or any other medical sources, the ALJ could not have properly ascertained plaintiff's ability to work. Accordingly, the undersigned concludes the ALJ's decision with respect to plaintiff's RFC is not supported by substantial evidence on the record as a whole.

## VI. RECOMMENDATION

For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be reversed and remanded under Sentence 4 of 42 U.S.C. § 405(g) for further evaluation. On remand, the ALJ shall (1) accept the opinion of Dr. Baak; (2) consider the need for a consultative examination; (3) redetermine plaintiff's RFC; and (4) make any other relevant findings.

The parties are advised that they have 14 days to file written objections to this Report and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.

/S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on November 24, 2010.